IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

MATRIX BUSINESS
RESOURCE, INC.,

                Plaintiff,

     v.

REF USA CORP.; REF
GLOBAL SERVICES CORP.;
RENAISSANCE EXECUTIVE
FORUMS, INC.,

                Defendants.

_____

Civ. No. 6:24-cv-01450-AA

**OPINION & ORDER**

AIKEN, District Judge.

This case comes before the Court on a Motion to Dismiss filed by Defendants REF Global Services Corp. and REF USA Corp.  ECF No. 23.  The Court concludes that this motion is suitable for resolution without oral argument.  For the reasons set forth below, the motion is DENIED.

## BACKGROUND

### I.    Factual Background

The following facts are derived from the Amended Complaint, ECF No. 18, and from the Declarations submitted by the parties.  ECF Nos. 24, 26, 27.  As will be discussed in greater detail below, resolution of a Rule 12(b)(6) motion is generally confined to the allegations of the pleadings and its attached exhibits, while

Defendants' jurisdictional arguments may draw on declarations and exhibits. For the sake of clarity, the Court presents the allegations and the information from the Declarations here, although it has confined its Rule 12(b)(6) analysis to the Amended Complaint and its attached exhibits.

Plaintiff MATRIX Business Resource, Inc. ("Matrix") is an Oregon corporation that "provides lead generation and marketing and client development services to the leadership development industry, specializing in building executive peer advisory groups." Am. Comp. ¶ 5.

Defendant REF Global Services Corp. ("REF Global") "holds itself out as 'a global organization that assembles peer advisory boards for top-tier business leaders.'" Am. Compl. ¶ 6. Matrix alleges that REF Global "holds itself out as the successor in interest to [Defendant] Renaissance Executive Forums, Inc." *Id.* ¶ 7. REF Global is a Delaware corporation with its principal place of business in either Delaware, *id.* ¶ 2, or in Florida, Hibler Decl. ¶ 16. ECF No. 24.

Defendant REF USA Corp. ("REF USA") "is a sister company of REF Global that specifically targets the United States market." Am. Compl. ¶ 7. Matrix alleges that "REF USA does not hold itself out to the public at all, or in the alternative, holds itself out as identical to REF Global." *Id.* ¶ 7. REF USA is a Delaware corporation with its principal place of business in either Idaho, *id.* ¶ 2, or in Delaware, Hibler Decl. ¶ 11. REF USA is also a successor in interest to Renaissance Executive Forums. Am. Compl. ¶¶ 7-8.

Renaissance Executive Forums, Inc. ("Renaissance") "is a defunct corporation that, while it was operating, also assembled peer advisory boards." Am. Compl. ¶ 8. Renaissance became inactive on December 28, 2021. Thornburg Decl. Ex. 4, at 1. ECF No. 26. Matrix was never informed that Renaissance was an inactive corporation during the relevant period. Clark Decl. ¶ 7. ECF No. 27. When it was operational, Renaissance was a California corporation with its principal place of business in Colorado. Am. Comp. ¶ 2.

REF USA and REF Global "are sister entities that are part the REF Brand." Hibler Decl. ¶ 7. REF USA "is the franchisor of the REF Brand in the United States," and "licenses use of the REF Brand (namely, its marks, business formats, systems, methods, procedures and training materials) to franchisees that own and operate independent outlets of the REF Brand." *Id.* ¶ 9. REF Global "is a shell entity that is to be used for any outlets of the REF Brand that are corporately owned." *Id.* ¶ 10. "[C]ertain officers and directors of REF USA Corp. are also officers and/or directors of REF Global Services Corp." *Id.* ¶ 3.

Matrix alleges that, at the relevant times, it understood that it was dealing with Renaissance and was not alerted to the distinction between Renaissance, REF USA, and REF Global. Am. Compl. ¶ 13 n.2.

Kat Valqui held herself out to Matrix "as head of Branding and Communications" for Renaissance but Matrix alleges that Valqui in fact represented REF Global and "she often appeared at meetings with representatives of REF USA and spoke in terms of 'we' when dealing with Matrix." Am. Compl. ¶ 9.

At the relevant times, Kimberly Hibler was the CEO of REF USA.  Hibler Decl. ¶ 2; Am. Compl. ¶ 13.  "Kat Valqui held herself at all times as being a representative of REF, including in the presence (via Zoom) of Kim Hibler."  Clark Decl. ¶ 8.

Prior to 2022, Renaissance "licensed a series of franchisees ('Partners') throughout the United States and Canada," and some of those Partners "approached Matrix to obtain lead generation and marketing services."  Am. Compl. ¶ 11.

On February 4, 2022, Valqui contacted Matrix via email to say that "Renaissance Executive Forums wanted to work more closely with Matrix in [the] USA and Canada, and to connect Matrix with all its Partners for lead generation services."  Am. Compl. ¶ 12.

During a call on February 14, 2022, with Valqui, Hibler, and other representatives of Defendants, Hibler "told Matrix that 'we' could provide '15, maybe even 20' opportunities to work with their Partners by the end of the year." Am. Compl. ¶ 13.  Valqui followed up the call with an email to Matrix in which Valqui said that "'we' wanted Matrix to be 'our allies to grow in the USA & CANADA markets."  *Id.*

At Valqui's request, Matrix prepared a formal proposal "to outline the actual terms of the planned working relationship," which Valqui told Matrix she needed to review with Hibler and with John Affleck, the COO of REF USA.  Am. Compl. ¶ 14.

Matrix began to prepare to work with "REF" and, on March 28, 2022, it reached out to Hibler to ask about the plan for a working relationship between Matrix and "REF."  Am. Compl. ¶ 15.  Matrix told Hibler that it had paused non-REF business outreach in areas that it planned to work with REF and informed Hibler that it would

"need to lift [the pause] and continue pursuing business if we are not moving forward." *Id.*

On March 31, 2022, Hibler replied "Yes, the plan is to move forward." Am. Compl. ¶ 16.

On April 21, 2022, Valqui "made representations about the ways in which REF planned to introduce Matrix to its Partners to drive business." Am. Compl. ¶ 17. However, by May 20, 2022, Matrix had not heard anything further and so it reached out to REF "to schedule a Zoom call or webinar with Partners and other REF affiliates ('Forum Leaders')," and Valqui responded that "REF" was interested in such a meeting, but no meeting was scheduled in November 2022. *Id.*

Matrix held a conference call with "REF leadership" on May 27, 2022, at which Valqui and Affleck told Matrix "that REF's plan was to include Matrix in its franchise agreements as an exclusive or preferred service provider." Am. Compl. ¶ 18. Affleck told Matrix that there were three to five Partners interested in engaging with Matrix, as well as other Forum Leaders, and told Matrix "that REF expected to enter a partnership with another company—ERA—which has '20 to 40 facilitators' that may also benefit from Matrix's services." *Id.* Matrix alleges that Affleck "knew that making these representations would cause Matrix to review its processes and increase its staff to accommodate the significant increase in work." *Id.*

On June 1, 2022, Affleck "repeated the promise that Matrix would be included in franchise agreements and updated his estimate of ERA's impact to 'up to 60 consultants'" and "asked Matrix to prepare its infrastructure to provide training for

ERA's consultants" and "to revise its pricing in its contracts to facilitate these plans." Am. Compl. ¶ 19. This revised pricing was to apply to already-existing contracts with REF Partners. *Id.* Matrix agreed and revised its pricing and contracts and "prepared to provide a high volume of work for the partnership with ERA." *Id.*

On June 16, 2022, Affleck told Matrix that there were "three to five, maybe six people coming your way," and asked if Matrix had sufficient staffing. Am. Compl. ¶ 20. Affleck represented to Matrix that "REF" was "definitely moving ahead with . . . ERA." *Id.* Matrix informed Affleck that it would "continue to build out its infrastructure to make sure it could handle the increased work." *Id.*

Matrix alleges that the representations made by Affleck on May 27, June 1, and June 16, 2022 were false and that "REF had no intention of either (a) including Matrix in its franchise agreements, or (b) introducing Matrix to ERA," and, in fact, "REF intended to use Matrix's work and proprietary information to begin offering lead generation services to ERA directly, cutting Matrix out entirely." Am. Compl. ¶ 21.

On June 23, 2022, following "extended negotiations" over terms, Matrix and "REF" entered into a "Corporate Partnership Master Agreement" (the "Agreement"). Am. Compl. ¶ 22. The Agreement was signed by a representative of Matrix and by Affleck. *Id.* The Agreement will be discussed in greater detail below, but Matrix acknowledges that it is not, by its own terms, a sales contract for services but alleges that it "reflected the terms under which the Matrix/REF partnership was to proceed" and that its terms "applied retroactively to Partners with whom Matrix was already

working—meaning that, notwithstanding that the Agreement was not a direct contract for services, the existence of the Agreement affected other contracts and thus cost Matrix money it would otherwise have earned." *Id.* ¶ 23.

On August 8, 2022, REF made "the only true referral it ever made during the course of its relationship with Matrix." Am. Compl. ¶ 24. Following this referral, Matrix notified Hibler that it had "ramped up" and was prepared to work with the promised REF referrals. *Id.*

On August 10, 2022, Affleck acknowledged that Matrix had doubled staff in response to his representations and told Matrix that "he would talk with CEO Hibler and Valqui to get the relationship moving forward." Am. Compl. ¶ 25.

On September 30, 2022, Affleck began to walk back the prospect of work with ERA, telling Matrix that "[w]e of course have no control over another organization[']s [*i.e.*, ERA's] lead generation choices." Am. Compl. ¶ 26. Matrix alleges that REF "continued to backpedal about ERA over the course of October" and, by November, Valqui "suggested that Matrix would only be invited to meet ERA consultants at a later stage because it would be 'too much information for the phase where they are now.'" *Id.* ¶ 27.

During this same period, Valqui and Affleck sought proprietary information from Matrix and Matrix alleges that "REF used the information it got from Matrix to replace Matrix as a provider of lead generation services." Am. Compl. ¶ 28.

On October 18, 2022, "REF" informed Matrix that Matrix would *not* be added to the franchise agreement as a required or preferred vendor. Am. Compl. ¶ 29. The

relationship between Matrix and "REF" deteriorated. "REF" criticized Matrix for reaching out to Partners for marketing purposes, despite the Agreement. *Id.* ¶ 30. Affleck, "whose Partner company also had an agreement with Matrix sought to terminate it and threatened Matrix with wider consequences if it sought to enforce that agreement, including restricting access to other REF Partners or Forum Leaders." *Id.*

Despite the deterioration of the relationship between REF and Matrix, Valqui offered, on December 27, 2022, to connect Matrix with ERA. Am. Compl. ¶ 31.

On January 5, 2023, Hibler "acknowledged that none of the promises made by REF were ever going to come to fruition," and also "recognized that COO Affleck had made promises, but that in fact there had *never* been an opportunity for Matrix to work with ERA." Am. Compl. ¶ 32 (emphasis in original).

## II.    The Agreement

The Corporate Partnership Master Agreement is attached as Exhibit 1 to the Complaint. ECF No. 18-1. It is signed by Trinity Clark as President/CEO of Matrix and John Affleck, the COO of REF USA, on behalf of "Renaissance Executive Forums, Inc." Am. Compl. Ex. 1, at 8. Affleck has also initialed the portions of the document labeled "Client Assumptions." *Id.* at 3-5.

The Agreement states that it is "not a sales contract of services but rather a template agreement reflecting the terms and conditions agreed upon between Renaissance Executive Forums, Inc. and MATRIX which will be used by REF Franchisees to hire MATRIX." Am. Compl. Ex. 1, at 2.

Among the "Client Assumptions" are the following terms:

> The Client . . . Agrees that after the Initial Term, the Agreement shall automatically renew to a month-to-month at the rate of $2500.00 per month. The client may renew their contract for an additional 6 months at the price of the Initial Term Agreement or discontinue services provided there is given a 30-day written notice prior to the termination of said agreement.
>
> The Client . . . Understands that that this agreement only applies to services for one (1) entity. "Entity" is defined as one (1) Partner/Forum Leader. Partners and Forum leaders are treated as separate entities and cannot be merged within this agreement.
>
> \*      \*      \*
>
> The Client . . . acknowledges as an REF Partner/Forum Leader, they accept personal responsibility for payment of services rendered by MATRIX and understands that REF USA Corp/ Renaissance Executive Forums, Inc. does not claim responsibility for, not obligated to the payment of services rendered by MATRIX.

Am. Compl. Ex. 1, at 4.

The Agreement also contains General Provisions, including a choice of law provision in which the signatories agreed that that the Agreement would be governed by and construed according to the laws of Oregon. Am. Compl. Ex. 1, at 7-8.

The General Provisions also contain an integration clause, which provides as follows:

> **Entire Agreement; Modification of Agreement:** This Agreement constitutes the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous oral or written communications, all of which are merged herein. Except as specifically provided for herein, this Agreement may not be altered, amended, or modified except by an instrument in writing signed by a duly authorized representative of each party.

Am. Compl. Ex. 1, at 8.

## LEGAL STANDARD

To survive a motion to dismiss under the federal pleading standards, a pleading must contain a short and plain statement of the claim and allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a pleading does not require "detailed factual allegations," it needs more than "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 677-78. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*. at 678.   Legal conclusions without any supporting factual allegations do not need to be accepted as true. *Id.*

## DISCUSSION

Matrix brings claims for (1) fraud, Am. Compl. ¶¶ 33-40; (2) breach of contract, alleging the breach of a written contract in the form of the Agreement, *id.* ¶¶ 42-47, and the breach of an oral contract, *id.* ¶¶ 48-54.  REF USA and REF Global move to dismiss, while Renaissance, as a defunct corporation, as not appeared.

## I.     Standing

Defendants move to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the basis that Matrix lacks standing. "[S]tanding is an essential and unchanging part of the case-or-controversy

requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must show three elements to establish standing. First is an "injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). Second, the injury must be "fairly traceable to the challenged action of the defendant," and not "the result of the independent action of some third party not before the court." *Id.* (internal quotation marks and citations omitted, alterations normalized). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks and citation omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.*

Here, Defendants assert that Matrix lacks standing because (1) the Agreement does not guarantee Matrix any compensation, rendering its damages "abstract," and "hypothetical," and (2) the Agreement disclaims any obligation on the part of Defendants to pay Matrix, meaning that Matrix's damages are not fairly traceable to Defendants.

The "threshold question of whether plaintiff has standing (and the court has jurisdiction) is distinct from the merits of the claim," and "the jurisdictional question of standing precedes, and does not require, analysis of the merits." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (internal quotation marks and citation omitted). At the pleading stage, "general factual allegations of injury resulting from the defendants' conduct may suffice, for on a motion to dismiss [courts] presume that

general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotation marks and citation omitted, alterations normalized).

The Amended Complaint alleges that Matrix took certain actions in reliance on Defendants' performance and that it suffered concrete financial and reputational losses when that performance failed to materialize. Am. Compl. ¶¶ 15, 18-20, 25, 38-40, 46, 54. This sort of "classic pocketbook injury" may be redressed by a favorable judgment and therefore is sufficient confer standing. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636-37 (2023). As alleged, the injury is fairly traceable to the acts of Defendants. Matrix has standing to pursue its claims.

## II. Failure to State a Claim

Matrix brings claims for (1) fraud, (2) breach of a written contract, in the form of the Agreement, and (3) breach of an oral contract.

### A. Fraud

Under Oregon law, a plaintiff seeking to bring a claim for fraud must plead and prove (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted upon; (6) the injured party's ignorance of its falsity; (7) the injured party's reliance upon the truth of the representation; and (8) the injured party's right to rely on the its truth. *Gunner, LLC v. Miller*, 332 Or. App. 263, 267 (2024). Fraud is subject to heightened pleading standards in federal court. Federal Rule of Civil

Procedure 9 requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).[1]

Here, Defendants challenge Matrix's showing on only two elements—the existence of an actionable representation and Matrix's right to rely on the representation.

First, with respect to the representation, Defendants argue that a claim for fraud must be a statement of presently existing fact and cannot rely on representations of conditions that might exist in the future.

"It is will settled that a representation, to be actionable, must relate to past or existing facts and cannot consist of the mere broken promises, unfulfilled predictions, or erroneous conjectures as to future events, but this rule is subject to the further rule that statements relating to the future will not preclude liability for fraud if such statements were intended and accepted as representation of fact and involved in a matter peculiarly within the speaker's knowledge, nor if the promises and predictions also involved a misstatement or concealment of existing facts." *Patterson v. Western Loan & Building Co.*, 155 Or. 140, 144 (1936); *See also Cia Estrella Blanca, Ltda v. S.S. Nictric*, 247 F. Supp. 161, 171-72 (D. Or. 1965) (holding that predictions and promises to do something in the future "cannot be made the basis of fraud," which "must related to a present or preexisting fact, and may not be predicated upon representation as to matters which are to happen in the future" unless "the evidence would indicated that promisor knew, at the time of the promise, that it could not be

---

[1] Defendants do not directly address the heightened pleading standards for fraud under Rule 9 in their motion to dismiss.

fulfilled."). "The mere nonperformance of a promise made in the course of negotiations or the failure to carry out an intention expressed in the course of such negotiations is not of itself either a fraud or evidence of a fraud, in the absence of allegations and proof that the representations were falsely and fraudulently made with intent to deceive; that is, that the statement of intent as to the future was made in bad faith." *Butte Motor Co. v. Strand*, 225 Or. 317, 321-22 (1960).

"To adequately allege that the defendant has no intention of keeping the promise or reckless disregard for an intention of performing, the plaintiff must allege facts permitting the plausible inference of the defendant's intent and must allege more than the defendants' later nonperformance." *Allen v. LoanDepot.com, LLC*, Case No. 3:21-cv-541-JR, 2022 WL 72108, at *3 (D. Or. Jan. 6, 2022).

Here, Matrix has alleged that Defendants, through Affleck and Valqui, made representations of present intentions and existing facts, notably that they would include Matrix in franchise agreements as a preferred or exclusive provider, Am. Compl. ¶¶ 18-19; that REF had a number of partners interested in engaging with Matrix and that REF would be entering into a partnership with ERA that would refer more business to Matrix, *id.*; that between three and six partners would be referred to Matrix and that the ERA arrangement would "definitely" be moving forward., *id.* ¶ 20. The Amended Complaint alleges that none of Affleck's promises were true and that "REF had no intention of either (a) including Matrix in its franchise agreement or (b) introducing Matrix to ERA" and instead "intended to use Matrix's work and proprietary information to begin offering lead generation services to ERA directly,

cutting Matrix out entirely." *Id.* ¶ 21.  On January 5, 2023, Hibler "acknowledged that none of the promises made by REF were ever going to come to fruition," and she recognized that Affleck had made promises, "but that in fact there had *never* been an opportunity for Matrix to work with ERA." *Id.* ¶ 32.  The allegations of the Amended Complaint sufficiently allege that the representations were falsely made based on then-existing knowledge with the intent to deceive Matrix.

Next, Defendants argue that Matrix had no right to rely on the representations because the Agreement specifically disclaims any obligation by Renaissance or REF USA to pay for any services rendered by Matrix for REF Partners or Forum Leaders. The "right to rely" element of a fraud claim under Oregon law "requires proof of the reasonableness of the reliance," and "such reasonableness is measured in the totality of the parties' circumstances and conduct." *Oregon Public Emps. Retirement Bd. v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428 (2004).  "Among other things, for reliance to be justifiable, the party claiming reliance must have taken reasonable precautions to safeguard his or her own interests under the particular circumstances of the case." *Vulanovich v. Kine*, 268 Or. App. 628, 635 (2015) (internal quotation marks and citation omitted).

Here, Matrix does not appear to base its fraud claim on non-payment under the Agreement but rather on the claim that Defendants used false representations to induce their reliance in the form of expanding operations, changing its pricing structure, and surrendering proprietary materials in exchange for the promised exclusive/preferred relationship.  *See, e.g.,* Am. Compl. ¶¶ 18-20, 25, 28.

In their Reply, Defendants shift to arguing that Matrix failed to take reasonable steps to protect itself based on *Vukanovich*. This argument is premature—*Vukanovich* dealt with the grant of a JNOV motion following trial and was based on the presentation of evidence to the jury. *Vukanovich*, 268 Or. App. at 634-35. This is an inapt standard to apply in a Rule 12(b)(6) motion about whether Matrix has sufficiently *alleged* its own reasonable reliance. The Court concludes that Matrix has done so.

Defendants also argue that the claims involve Renaissance and not REF Global or REF USA, but the record indicates that Renaissance was defunct before negotiations even took place. The Amended Complaint alleges (and Defendants' declarations support) that REF Global and REF USA are closely intertwined companies within the "REF Brand" with overlapping officers and that REF USA officers, notably Hibler and Affleck, were directly involved in the negotiations with Matrix and that, together with Valqui, they identified themselves as representing "REF," without disclosing which specific entity was involved, given that Renaissance was defunct at the time. On this record, the Court concludes that Matrix has sufficiently alleged the intermingled relationship between the various REF entities and that the named Defendants were involved. In sum, the Court denies the motion to dismiss Matrix's claim for fraud under Rule 12(b)(6).

## B. Breach of Contract (Written)

To plead a breach of contract claim under Oregon law, a plaintiff must show: (1) the existence of a contract; (2) its relevant terms; (3) the plaintiff's full

performance and lack of breach; and (4) the defendant's breach resulting in damage to the plaintiff. *Schmelzer v. Wells Fargo Home Mortg.*, No. CV-10-1445-HZ, 2011 WL 5873058, at \*4 (D. Or. Nov. 21, 2011) (citing *Slover v. Or. Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570-71 (1996)).

First, Defendants argue that, by its terms, the Agreement is between Matrix and Renaissance and not with REF USA or with REF Global. However, as discussed, the boundaries between the various REF entities are not clear and, Matrix alleges, were not clearly communicated to it during the negotiation of the Agreement. Am. Compl. ¶¶ 9, 13 n.2. The Agreement was negotiated and signed by Affleck, an officer of REF USA, *after* Renaissance had become defunct, which supports the reasonable inference that he was negotiating on behalf of REF USA. REF USA is also mentioned in the Agreement, in section disclaiming its obligation to pay Matrix for services it rendered to REF Partners and Forum Leaders. *Id.* Ex. 1, at 4. This also supports the reasonable inference Affleck was signing on behalf of REF USA. Finally, Matrix has plausibly alleged that REF Global and REF USA are successors in interest to Renaissance. *Id.* ¶¶ 6-8. Matrix has plausibly alleged that Defendants are not strangers to the contract and the Court declines to dismiss on that basis.

Next, Defendants argue that the Agreement is a contract *in futuro*—an agreement to agree—and, as such, it is not enforceable. However, this understates the terms of the Agreement. While it is "not a sales contract for services," it is a "template agreement reflecting the terms and conditions agreed ipon between Renaissance Executive Forums, Inc. and MATRIX which *will be used* by REF

Franchisees to hire MATRIX." Am. Compl. Ex. 1, at 2 (emphasis added). It is a concrete agreement and not, as Defendants contend, an agreement to agree in the future. The Court declines to dismiss Matrix's claim for breach of the written contract.

### C. Breach of Contract (Oral)

A contract may be written or oral. *Ponderosa Props., LLC v. Emp't Dep't*, 262 Or. App. 419, 435 (2014). When "determining whether a contract exists and what its terms are," the court "examine[s] the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 201 Or. App. 568, 578 (2005). "If the parties' communications and actions manifest assent to be bound by promises, they will form a contract unless the promises are 'so indefinite that a court cannot determine what the parties intended.'" *Wieck v. Hostetter*, 274 Or. App. 457, 472 (2015) (internal quotation marks and citation omitted). To be enforceable, the oral contract must represent a meeting of the minds on "the essential terms," but not necessarily all the terms. *PacifiCorp v. Lakeview Power Co.*, 131 Or. App. 301, 307 (1994).

Defendants object that Matrix's claim for breach of an oral contract is inconsistent with their claim for breach of a written contract. However, Matrix's claim for breach of an oral contract is expressly pleaded in the alternative to its claim for breach of a written contract. Am. Compl. ¶ 48. A plaintiff is permitted, under the Federal Rules of Civil Procedure, to plead alternative claims, "regardless of consistency." Fed. R. Civ. P. 8(d)(3).

Relatedly, Defendants assert that the claim for breach of an oral contract is barred by the integration clause of the Agreement, which disclaims any outside agreements or understandings. In making this argument, however, Defendants seek to have their cake and eat it too—the integration clause would only apply if the Agreement is a valid contract between the parties, which Defendants vigorously deny, and if the Agreement is a valid contract between the parties, then there would be no need to reach Matrix's claim in the alternative. Conversely, if the Agreement is not, as Defendants contend, a valid contract, then its integration clause would have no application to any oral contract between the parties.

Defendants also argue that Matrix not described the terms of the alleged oral contract. The Amended Complaint alleges that Defendants made specific promises to Matrix, outlined in particular paragraphs of the Complaint, Am. Compl. ¶ 49, and that Defendants did not perform those promises, causing harm to Matrix, *id*. ¶¶ 53-54. The Court declines to dismiss Matrix's claim for breach of the oral contract.

## III.   Personal Jurisdiction

"An exercise of personal jurisdiction in federal court must comport with both the applicable state's long-arm statute and the federal Due Process Clause." *Burri Law PA v. Skurla*, 35 F.4th 1207, 1212 (9th Cir. 2022). Oregon's long-arm statute "authorizes personal jurisdiction over defendants to the full extent permitted by the United States Constitution." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015). Accordingly, the Court must examine whether its exercise of jurisdiction over Defendants would comport with the limits imposed by federal due process.

There are two types of personal jurisdiction that a court may exercise over a defendant: general and specific personal jurisdiction. *Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). Here, the parties agree that general personal jurisdiction does not apply.

"Federal due process permits a court to exercise personal jurisdiction over a non-resident defendant if that defendant has at least minimum contacts with the relevant forum such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106, (9th Cir. 2020) (internal quotation marks and citation omitted). The Ninth Circuit uses a three-prong test to analyze whether a party's minimum contacts meet the due process standard for the exercise of specific personal jurisdiction. *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 859 (9th Cir. 2022).

"First, the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Glob. Commodities*, 972 F.3d at 1107 (internal quotation marks and citations omitted, alterations normalized). Second, the plaintiff's "claim must arise out of or relate to the defendant's forum-related activities." *Id.* Third, the district court's exercise of personal jurisdiction over the defendant must be reasonable. *Id.*

"All three prongs must be satisfied [for a court] to assert personal jurisdiction." *LNS Enters.*, 22 F.4th at 859. "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Glob. Commodities*, 972 F.3d at 1107 (internal quotation marks and citation omitted).

Under the first prong of the specific-jurisdiction inquiry, "purposeful availment" and "purposeful direction" are "distinct concepts." *Glob. Commodities*, 972 F.3d at 1107. Purposeful availment generally provides a more useful frame of analysis for claims sounding in contract, while purposeful direction is often the better approach for analyzing claims in tort, but "[a]t bottom, both purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a rest of random, fortuitous, or attenuated contacts." *Id.* (internal quotation marks and citation omitted).

### A. Purposeful Availment

To establish purposeful availment, courts look at a defendants "entire course of dealing" with the forum state, "not solely the particular contract or tortious conduct giving rise to [a plaintiff's] claim." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1163 (9th Cir. 2023) (internal quotation marks and citation omitted). "It exists when a defendant's dealings with a state establishes a 'quid pro quo'—where the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws and in return

submits to the burdens of litigation in the state." *Id.* (internal quotation marks and citation omitted, alteration normalized). "In other words, [courts] examine whether the defendant 'deliberately reached out beyond [its] home—by, for examine, exploiting a market in the forum State or entering a contractual relationship centered there.'" *Id.* (quoting *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023)). Purposeful availment can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing. *Burger King v. Rudzewicz*, 471 U.S. 462, 479 (1985). However, entering a contract with a forum state resident is not enough in itself to establish minimum contacts. *Id.* at 478. "[B]usiness activity constitutes purposeful availment when that activity reaches out and creates continuing relationships and obligations in the forum state." *Silk v. Bond*, 65 F.4th 445, 457 (9th Cir. 2023) (internal quotation marks and citation omitted).

Here, Defendants assert that REF Global and REF USA have not entered into contracts with any Oregon-based entities and do not provide services in Oregon or to Oregon residents. Hibler Decl. ¶¶ 14-15, 19-20.

However, as previously discussed, the boundaries between the various REF entities do not appear to have been vigorously maintained or communicated. Renaissance was a defunct company before negotiations with Matrix began and the evidence before the Court is that officers and employees of REF USA, including both Hibler and Affleck, and Valqui, an employee of REG Global, were directly involved in the negotiations and the Agreement was signed by Affleck, an officer of REF USA.

REF Global and REF USA are alleged to be the successors in interest to Renaissance Executive Forums. On this record, there does appear to be a contract between Defendants and an Oregon-based entity, Matrix.

Furthermore, Matrix has provided evidence in the form of the Clark Declaration, that Defendants sought out Matrix in Oregon "seeking to build a direct business relationship." Clark Decl. ¶ 5, Ex. 1. "Every communication described in Matrix's complaint took place while Matrix's representatives were located in Oregon," and "[a]ll of the REF representatives involved knew that." *Id.* ¶ 11. The Agreement also contemplated continuing contacts between REF franchisees and Matrix by establishing that it was the template by which such agreements would be made. "REF" (presumably REF USA and/or REF Global, as Renaissance was defunct) apparently paid Matrix for its lead generation services under the Agreement on at least one occasion. Clark Decl. Ex. 3, at 1. Furthermore, the Agreement provided that it would governed by and construed according to the laws of Oregon.[2] Am. Compl. Ex. 1, at 7-8.

In sum, Defendants sought out Matrix in Oregon; engaged in an apparently protracted course of negotiations to secure the Agreement by which Matrix would provide services to REF franchisees on a continuing basis; signed a contract with Matrix which it agreed would be governed by Oregon law; and, on at least one

---

[2] The presence of a choice of law provision is a valid consideration in assessing purposeful availment. *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1399-1400 (9th Cir. 1988); *see also Davis v. Cranfield Aeropace Sols. Ltd.*, 71 F.4th 1154, 1164 (9th Cir. 2023) (finding the absence of an Idaho choice of law provision weighed against purposeful availment in Idaho).

occasion, paid Matrix for services it provided in Oregon under the Agreement.  The Court concludes that this suffices to establish purposeful availment.

### B. Purposeful Direction

Matrix has also alleged a claim for fraud, an intentional tort. Suits sounding in tort are generally assessed under the purposeful direction analysis. *Schwarzeneggar v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2002).  To determine whether a defendant "purposefully directed" its activities toward the forum, courts apply the "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984).  "That test focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred in the forum," and asks "whether the defendant: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1091 (9th Cir. 2023) (internal quotation marks and citations omitted).  Under the second prong of the "effects" test, a plaintiff must demonstrate that the defendant expressly aimed its actions at the forum state and "'something more' than mere foreseeability is required in order to justify the assertion of personal jurisdiction, and that 'something more' means conduct expressly aimed at the forum." *Fatnani v. JPMorgan Chase Bank, N.A.*, 743 F. Supp.3d 1253, 1268-69 (D. Or. Aug. 1, 2024) (internal quotation marks and citation omitted, alterations normalized).

Here, Matrix alleges, as discussed in the preceding section, that Defendants made a number of fraudulent representations to the Oregon-based Matrix to induce

it to enter into the Agreement, to expand its operations and staffing, and to deliver proprietary information to Defendants, with the knowledge that their statements were false and the knowledge that Matrix would suffer harm in Oregon as a result. In their Reply, Defendants do not address Matrix's arguments concerning purposeful direction. The Court concludes that the record is sufficient to establish purposeful direction as a basis for personal jurisdiction.

### C. Causation

To assess whether the claims arise out of Defendants' Oregon-related activities, courts use a "but-for" test. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1131-32 (9th Cir. 2003). Here, the injuries alleged to have been suffered by Matrix are the but-for result of Defendants' actions in connection with the Agreement with Matrix and their allegedly fraudulent promises to Matrix in Oregon. The Court concludes that causation is sufficiently established.

### D. Reasonableness

Once it has been determined that a defendant has established minimum contacts with a forum, the defendant must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Courts consider seven factors in weighting reasonableness: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution

of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Harris Rutskey & Co.*, 328 F.3d at 1132. No one factor is dispositive and courts balance all seven factors. *Id.*

Defendants do not present any argument concerning the reasonableness of the exercise of jurisdiction and so have failed to carry their burden of demonstrating that the exercise of personal jurisdiction is unreasonable. The Court has assessed the various factors and concludes that the exercise of personal jurisdiction in Oregon is reasonable. The Court therefore declines to dismiss the Amended Complaint on the basis of a lack of personal jurisdiction.

## IV.    Venue

Defendants move to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1391(b). However, this action was removed from state court and so is governed by 28 U.S.C. § 1441(a), rather than § 1391. *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665-66 (1953); *see also Chrisman v. Promote Mexico, LLC*, CV 19-10834 DSF (JCx), 2020 WL 2735620, at *3 (C.D. Cal. Feb. 24, 2020) ("Section 1391 limits the districts in which a civil action ma by 'brought.' This action was not 'brought' in federal court, it was removed from state court and therefore § 1391 is inapplicable." (internal citation omitted)).

Under § 1441(a), cases may be removed "to the district court of the United States for the district and division embracing the place where such action is pending." This case was removed from Douglas County Circuit Court, ECF No. 1, which is part

of the Eugene Division of the District of Oregon.  LR 3-2(a)(3).  Venue is therefore proper and Defendants' motion to dismiss based on improper venue is DENIED.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF No. 23, is DENIED.

It is so ORDERED and DATED this _____9th_____ day of March 2026.


 /s/Ann Aiken_____
ANN AIKEN
United States District Judge